UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROXANA SABERI<br>c/o Gilbert LLP<br>1100 New York Avenue, NW<br>Suite 700<br>Washington, D.C. 20005<br><br>                    Plaintiff,<br><br>        v.<br><br>THE GOVERNMENT OF THE<br>ISLAMIC REPUBLIC OF IRAN,<br>Its Ministries, Agencies, and Instrumentalities<br>c/o Ministry of Foreign Affairs<br>Imam Khomeini Avenue<br>P.O. Box 1136914811<br>Tehran, Iran<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **JURY DEMAND**<br><br><br>**Case No.:** 19-1081 |

## COMPLAINT

Plaintiff Roxana Saberi complains of the actions of the Defendant, The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities, and states in support thereof as follows:

## PARTIES

1.      Plaintiff Roxana Saberi ("Ms. Saberi") is a United States citizen. Ms. Saberi was falsely imprisoned and tortured for a period of months by Defendant The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities ("Iran").

2.      Iran is a foreign sovereign that the Secretary of State of the United States designated as a state sponsor of terrorism on January 19, 1984. *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (citing 50 U.S.C. App. § 2405(j) ("The Export Administration Act of 1979"),

*repealed and replaced by* 50 U.S.C. § 4813(c)(3) ("The Export Control Reform Act of 2018")).[1]

Its activities as complained of herein are outside the scope of immunity provided by the Foreign

Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

## JURISDICTION

3.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant

to the FSIA, 28 U.S.C. § 1605A.

4.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

5.      Ms. Saberi was domiciled in the State of North Dakota at the time of her

confinement and torture.

## STATEMENT OF FACTS

6.      Ms. Saberi was born in Belleville, New Jersey in 1977.  Her parents are

naturalized U.S. citizens who immigrated to the U.S. in 1973, her father from Iran and her

mother from Japan.  Her father has a graduate degree in English literature, and her mother is an

M.D. with a specialty in pathology.  Ms. Saberi and her older brother, Jasper, were raised in

Fargo, North Dakota, where her parents continue to live today.  Jasper has served in the United

States Army since 2002, and he was deployed once to Iraq and twice to Afghanistan.

7.      Ms. Saberi graduated *summa cum laude* in 1997 from Concordia College in

Moorhead, Minnesota, with bachelor's degrees in communications and French.  She graduated

*cum laude* from Northwestern University's Medill School of Journalism in 1999 with a master's

degree in journalism, and from the University of Cambridge in 2000 with a master's degree in

international relations.

---

[1] *See also State Sponsors of Terrorism*, United States Department of State,
https://www.state.gov/j/ct/list/c14151.htm (last visited Apr. 16, 2019).

8.      In 2003, Ms. Saberi moved to Iran to open and run the Middle East bureau for a U.S.-based news agency, Feature Story News, which served clients such as PBS, NPR, and Fox News.  In addition to her work, Ms. Saberi learned about her father's heritage by traveling within Iran and learning Farsi, her father's native language.  As a citizen of both the United States and Iran, Ms. Saberi was able to move to Tehran and travel within the country.

9.      When she began work as a correspondent, Ms. Saberi was issued official press credentials from Iran's Ministry of Culture and Islamic Guidance, which allowed her to attend and report on official events.  She took several Farsi classes at the Dehkhoda International Center for Persian Studies, and later enrolled in the School of International Relations in Tehran, where she pursued graduate courses in Iranian studies and international relations.

10.     Ms. Saberi had planned to stay in Iran for only one or two years, but she was so captivated by the country, its people, and the life she had established there that she stayed for six years.

11.     In 2006, however, the Iranian authorities revoked Ms. Saberi's official press credentials without explanation.  She considered leaving the country, but she had fallen in love with it, so she decided to stay.  She began writing a book about life in Iran as seen through the eyes of a wide range of Iranians.  For her research, she interviewed dozens of Iranians from different parts of society.  In the meantime, she continued working as a freelance journalist throughout the region, reporting from the various places she traveled.

12.     Ms. Saberi's life in Tehran took a drastic turn on January 31, 2009.  That morning, four plainclothes Iranian intelligence agents forced their way into Ms. Saberi's apartment, sifted through her belongings, arrested her without warning, and told her that if she did not cooperate, they would take her immediately to Evin Prison—a Tehran jail notorious for

holding Iran's most famous political prisoners, and as the site of torture, hangings, and a mass execution.

13.     The agents seized her phone, notebooks containing her work on the book, her laptop, the hard drive of her desktop computer, her Iranian passport, and her American passport, among other things.  The agents forced Ms. Saberi into an awaiting vehicle and then took her to an unmarked building, where she was placed in a windowless room and interrogated for several hours.

14.     Her interrogators focused their questions primarily on her book.  They insisted she could not possibly be doing "so many interviews" only for a book and maintained that she was being paid to use it as a "cover" to gather intelligence for the United States Central Intelligence Agency ("CIA").  Their questions were relentless, and they would not accept her truthful answers—that she received no payment for the book and that she was not a spy for the CIA.

15.     Dissatisfied that she would not concede and confess, the men took her straight to solitary confinement at Evin Prison, where she was forced to strip naked, submit to a search, and wear a blindfold.  She was then placed in a roughly seven-foot by nine-foot concrete cell, which she later learned was within Evin's "Section 209," a section notorious for holding Iran's political prisoners and subjecting them to torture.

16.     On February 1, 2009, she was taken before a Magistrate Judge at a Revolutionary Court in Tehran and charged with "acting against Iran's national security," which she denied. She was instructed that she could speak to a lawyer only after her interrogation was complete and that the interrogation could last "maybe one week, maybe one month, maybe longer.  It depends

when your interrogators are satisfied with your answers." The Magistrate instructed the guard to return Ms. Saberi to Evin Prison.

17.     Ms. Saberi remained in solitary confinement for two weeks. A bright light was kept on 24 hours a day to invoke sleeplessness and sensory deprivation. The cell was cold, dirty, and infested with ants. Ms. Saberi was forced to sleep on frayed military blankets on a cement floor that was covered with a thin, worn-out carpet. She was given no paper, pen, or books, except the Koran, and she had no way of telling time. Ms. Saberi was permitted to leave her cell only to use the bathroom down the hall and, later, for 20 minutes, three days a week, to walk in circles in a small yard with concrete walls and rails crisscrossing overhead. Except for her interrogation sessions and brief encounters with the guards, she had no human contact.

18.     Ms. Saberi was never permitted to inform her loved ones about what had happened to her, leading them to believe for the first 12 days of her incarceration that she had been either kidnapped or killed. The first two occasions she was permitted to make phone calls, she was forbidden from telling the truth about her whereabouts or her imprisonment. Iran did not inform Ms. Saberi's parents of where or why it was holding Ms. Saberi (and only revealed her location on March 3—31 days after her arrest).

19.     As a journalist covering Iran, Ms. Saberi was painfully aware of the fate that had befallen other political detainees in Evin Prison, such as Iranian-Canadian journalist Zahra Kazemi, who had been declared dead shortly after her arrest in 2003. According to the doctor who examined Ms. Kazemi's corpse and escaped Iran to disclose his findings, Ms. Kazemi had been raped, her nose broken, and her skull fractured.[2]

---

[2] Committee to Protect Journalists, *Doctor Says Journalist in Iranian Custody Was Tortured and Raped Before Her Death* (Apr. 1, 2005, 12:00 PM ET), https://cpj.org/2005/04/doctor-says-journalist-in-iranian-custody-was-tort.php; *Canadian Tortured for Days, Says Iranian Doctor*, CBC News, Apr. 1, 2005, https://www.cbc.ca/news/canada/canadian-tortured-for-days-says-iranian-doctor-1.550471.

20.     Ms. Saberi was interrogated for several days, each time for hours on end. During these sessions, Ms. Saberi's male interrogators—who numbered at least four—sat her at a school desk, blindfolded and facing the wall, while they stood behind her, hammering her with questions in Farsi. Although Ms. Saberi had learned conversational Farsi, her familiarity with the language was not sufficient to withstand this questioning or to express adequate responses under interrogation conditions. The thick, padded door to the interrogation room could not mask the sounds of the screams from other prisoners who she believed were being physically tortured nearby. Ms. Saberi feared that physical torture was imminent and that the agents might kill her and deny they ever saw her, as they threatened on numerous occasions. With "agents all over the world," they also threatened to find her family in the United States. This "white torture"—a form of psychological torture involving a loss of personal identity through intimidation, manipulation, and prolonged periods of isolation—is a tactic known to be used by Iranian intelligence, particularly against political prisoners held in Evin Prison.

21.     Ms. Saberi was repeatedly told that if she "cooperated" and confessed to spying for the CIA, she would soon be released. She was told that if she did not, she would stay in Evin Prison for 20 years. Her interrogators also repeatedly reminded Ms. Saberi that under Iranian law, espionage could result in execution. Ms. Saberi was told that she would continue to be interrogated for as long as it took unless and until she confessed to being a spy.

22.     Although much of the questioning focused on Ms. Saberi's book as a cover for her supposed involvement with the CIA, the agents also insulted Ms. Saberi's character, criticized her journalism work (including allegations that some of her reports for Fox News—"an arm of the Pentagon,"—contained "analysis" that helped the CIA), and taunted her about her personal and professional life. On one occasion, her male interrogators delighted in running

through a long list of what they claimed were Ms. Saberi's romantic partners, pressing her to falsely admit to having sex with a number of men—in writing and on camera.

23.     Having suffered relentless threats, interrogations, and psychological abuse, Ms. Saberi ultimately broke under her captors' pressures and capitulated in the hope of being released and reunited with her family and friends, as they had promised. A strong-willed, highly principled woman of faith, Ms. Saberi was deeply shamed by her false confession.

24.     Ms. Saberi was forced to recount her false confession repeatedly and to recite it on camera not once, but four times, for the Iranian Intelligence Ministry. In addition, Ms. Saberi was threatened not to tell anyone about her arrest and imprisonment, and she was forced to agree to work as a spy for the Iranian Intelligence Ministry upon her release. Even after confessing, she was told that if she leaked any information regarding her incarceration, upon release, her interrogators would find and kill her, making it "look like a car accident." On another occasion, her chief interrogator pledged to "personally sign" her "death warrant" if she spoke out.

25.     On Sunday, March 8, 2009, after 36 days in prison, Ms. Saberi was again taken to the Revolutionary Court to appear before the Magistrate. He expressed interest in visiting the State of Ohio and hinted that he could free her in exchange for a visa to the United States. He also asked her to repeat her "confession" in writing. Instead, she recanted her false confession.

26.     As she was escorted out of the Magistrate's office, Ms. Saberi encountered a lawyer who said he had been hired on her behalf. She learned that the story of her wrongful detention was being reported by the international news media, though she did not learn until later that it had caused an international uproar and that her treatment was widely being labeled a violation of basic human rights. Secretary of State Hillary Clinton called for Ms. Saberi's immediate release, raising questions over Iran's legal process and stating that Iran appeared

"impervious" to human rights concerns and "civilized standards."[3]  Although Ms. Saberi was

grateful for the public outcry over her imprisonment, the Iranian Intelligence Ministry was not

pleased with this publicity.

27.     Later that night, on March 8, Ms. Saberi recanted the false confession to her main

interrogator, who then admitted to her, "We knew from the very beginning that it was a lie."

28.     On March 9, Ms. Saberi was taken back to the Revolutionary Court, where she

met Tehran's deputy prosecutor for security affairs and again recanted her false confession.  He

told her that although he had planned to free her, he now planned to keep her at Evin for one or

two years.  His assistant also wanted Ms. Saberi to go on camera to "criticize the U.S.," but she

refused.  She later learned that the prosecutor, named Haddad (also known as Hassan Zare

Dehnavi), was second-in-command under the prosecutor general Saeed Mortazavi—the man

human rights activists held responsible for Iranian-Canadian journalist Zahra Kazemi's death,

nicknamed by Iranians as the "Torturer of Tehran" and the "Butcher of the Press."  Indeed, the

United States and the European Union have imposed sanctions on Mortazavi for his human

rights violations, and the European Union has imposed such sanctions on both men.[4]

29.     Sometime in March, Ms. Saberi was told by a prison guard that she would be

released on a $1 million bail.  The interrogations continued.

30.     On Thursday, April 9, 2009, Ms. Saberi was allowed to call her father, and he told

her that she was set to go on trial for espionage the following week.

---

[3] *See, e.g.,* Sue Pleming, *Clinton Says Jailed Reporter on Hunger Strike,* Reuters, Apr. 30, 2009, https://www.reuters.com/article/us-iran-journalist-clinton/clinton-says-jailed-reporter-on-hunger-strike-idUSTRE53T52I20090430; Henry Newman and CoCo Ferguson, *Iran Must Free Roxana Saberi,* The Guardian, Mar. 25, 2009, https://www.theguardian.com/commentisfree/2009/mar/24/iran-usa.
[4] *See, e.g.,* Center for Human Rights in Iran, *EU Finalizes Sanctions for 32 Individuals in Iranian Government Who Violated Human Rights* (Apr. 15, 2011), https://www.iranhumanrights.org/2011/04/eu-sanctions-officials/; *Fact Sheet: New Executive Order Targeting Iranian Officials Responsible for or Complicit in Serious Human Rights Abuses,* United States Department of the Treasury (Sept. 29, 2010), https://www.treasury.gov/press-center/press-releases/Pages/tg877.aspx.

31.     That Sunday, April 12, 2009, 71 days after being arrested, Ms. Saberi was taken back to the Revolutionary Court. She met her lawyer there, and he informed her that he had just obtained her file that day. She also spoke to the judge, who made clear that he presumed her guilt, asking her questions such as, "How could you agree to spy for the U.S.? Don't you care about the Islamic Republic?" The judge also granted her attorney's request to postpone the trial for two weeks.

32.     Despite this, the trial took place the next day. Ms. Saberi had not had a chance to discuss her case with her attorney ahead of the trial, and she did not realize that the trial had begun until several minutes after it started. The trial lasted roughly 30 minutes and was closed to the public, the press, and her parents, who had traveled to Iran to support Ms. Saberi. The Swiss, who represent U.S. interests in Iran, were also denied access to the trial and to Ms. Saberi, as they were throughout her incarceration, despite several requests. The judge clearly took the side of the prosecuting team and Intelligence Ministry, who offered no witnesses or evidence—other than her false confession, which she continued to recant—to support the fabricated accusations against her. Ms. Saberi's attorney—who had told her he was "under pressure" by the authorities—hardly uttered a word, and she had to try to defend herself in Farsi.

33.     On Saturday, April 18, 2009, Ms. Saberi was convicted and sentenced to eight years in prison. She signed the notice of her conviction but also wrote, "I object," because she was not given due process. The judge granted her 20 days to appeal the verdict.

34.     To protest her wrongful conviction, Ms. Saberi felt she was left with no alternative than to go on a hunger strike on April 20.

35.     That same day, Ms. Saberi was permitted to meet briefly with her parents, but the meeting was moderated and carefully supervised by her main interrogator, who previously led

the brunt of the attacks against Ms. Saberi.  He ordered Ms. Saberi to speak only in Farsi, which

her mother did not understand well, despite the fact that he himself was practically fluent in

English.  Although Ms. Saberi had hoped to speak with her parents about her case, her

interrogator launched into a diatribe in Farsi directed at Ms. Saberi's father, wherein he warned

him of the risk of his and the media's involvement in the case, threatening that it could do more

harm than good.  Ms. Saberi's interrogator stated that "the Islamic Republic had gone its own

way for the past thirty years and did not care what the foreign media said about it," reminded

Ms. Saberi's parents that they were in Iran as Iranian citizens, and warned them that "God forbid

a problem might arise" during their stay if they continued engaging the press.  Such threats, as

well her parents' anxiety over her incarceration and their health problems (Ms. Saberi's father

suffered from high blood pressure and had undergone quadruple bypass heart surgery a few years

earlier) deepened Ms. Saberi's own distress.

36.     By April 23, the fourth day of her hunger strike, Ms. Saberi had already lost at

least ten pounds, and her weight had plummeted to 104 pounds.  Ms. Saberi was taken back to

the Revolutionary Court, where she was again questioned and taunted by Haddad, the "Torturer

of Tehran's" deputy prosecutor.  He warned that if she retained any of the three Iranian human

rights attorneys she requested, he would see to it that she would not be released.  Faced with that

threat, she had to work with the two attorneys he found acceptable.

37.     As her hunger strike continued, Ms. Saberi's parents implored her to stop because

they feared she would die.  Ms. Saberi concluded her hunger strike two weeks after it began, on

May 4, 2009.  She had lost more than fifteen pounds.

38.     Six days later, her appellate trial began.  This time, Ms. Saberi's trial lasted

around four hours.  Her new, second lawyer was not provided with her file in advance of the

trial, nor was she permitted to discuss her case with him until a few minutes before the trial
started. The trial was again conducted behind closed doors. As with the first trial, the Swiss and
Ms. Saberi's parents were not permitted to attend.

39.   The next day, on May 11, 2009, the Iranian appeals court delivered its decision.
The court reduced Ms. Saberi's sentence to a two-year suspended sentence and banned
Ms. Saberi from journalism in Iran for the next five years. She was released later that day.

40.   On May 14, the Iranian state-run broadcaster reported that the "Iranian
Intelligence Ministry says that despite being released, Iranian-American journalist Roxana Saberi
was proven to be involved in acts of espionage."[5]

41.   Ms. Saberi and her parents flew out of Iran that night.

42.   Ms. Saberi's confinement caused her severe and extreme psychological distress,
both during and after her imprisonment. For approximately three years following her release,
Ms. Saberi suffered from extreme guilt and shame and had suicidal thoughts. This was one
reason that during that time, she was unable to return to working as a full-time journalist. She
has also grappled with Iran's attempts to destroy her reputation by fabricating an accusation that,
before her arrest, she had obtained a classified document.

43.   Ms. Saberi has suffered and continues to suffer from post-traumatic stress
disorder, periods of depression and anxiety, nightmares, and other lasting psychological damage
from her captivity and torture. Even now, she often fears that Iranian intelligence agents are
following and monitoring her, particularly because she has received threatening e-mails in Farsi
and because her e-mail account has been hacked more than once. She will forever mourn the

---

[5] Robert Mackey, *Roxana Saberi Arrives in Vienna from Iran*, N.Y. Times: The Lede (May 14, 2009, 9:34 PM),
https://thelede.blogs.nytimes.com/2009/05/14/roxana-saberi-leaves-iran/.

loss of a land she had come to love, as well the close relationships she had established with her friends and relatives there, many of whom Iranian officials forced to cut ties with her.

44.     Ms. Saberi still suffers from the financial effects of her experience, including tuition lost for the master's degree she was unable to complete because of her imprisonment, losses incurred from having to sell her apartment in Tehran at a below-market rate to avoid confiscation by Iranian authorities, and losses from an inability to return to her pre-incarceration professional capacity in Iran.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING:  28 U.S.C. § 1605A)

45.     Paragraphs 1 through 44 above are incorporated as if set forth herein.

46.     Ms. Saberi was a citizen of the United States when arrested and held unlawfully by Iran.  While being held, Ms. Saberi was tortured as described herein.

47.     Anti-terrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal right of action against Iran for committing acts of hostage-taking and torture.

48.     Section 1605A provides four elements for a claim against a foreign state, all of which are met here:

   a.     That defendant be designated as a state sponsor of terrorism;

   b.     That claimant be a national of the United States;

   c.     That the foreign country must be given reasonable opportunity to arbitrate that claim if the conduct took place on foreign soil; and

   d.     That the personal injury is alleged to have been caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."

49.     Iran was designated a state sponsor of terrorism by the Secretary of State on

January 19, 1984. *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

50.     Ms. Saberi was a citizen of the United States at the time of her imprisonment and

torture.

51.     The definition of "torture" under the FSIA, derived from Section 3 of the Torture

Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992),

codified at 28 U.S.C. § 1350 (note), includes:

> [A]ny act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering (other than pain or suffering arising only
> from or inherent in, or incidental to, lawful sanctions), whether physical or mental,
> is intentionally inflicted on that individual for such purposes as obtaining from that
> individual or a third person information or a confession, punishing that individual
> for an act that individual or a third person is committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind . . . .

52.     While Ms. Saberi was in Iran's custody and control, Iran intentionally subjected

Ms. Saberi to 100 days of pain and suffering, including solitary confinement, sleep and sensory

deprivation, mental abuse, and threats, all with the intent to obtain a false confession, pressure

her to spy for Iran, and coerce her cooperation.  Iran's conduct constitutes torture as defined

under the FSIA.

53.     "Hostage-taking" under the FSIA, 28 U.S.C. § 1605A(h)(2), as derived

from Article 1 of the International Convention Against the Taking of Hostages, Dec. 17, 1979,

1316 U.N.T.S. 205, is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to
> detain another person (hereinafter referred to as the "hostage") in order to compel
> a third party, namely, a State, an international intergovernmental organization, a
> natural or juridical person, or a group of persons, to do or abstain from doing any
> act as an explicit or implicit condition for the release of the hostage commits the
> offence of taking of hostages ("hostage-taking") within the meaning of the
> Convention.

54. Iran detained Ms. Saberi on false espionage charges and threatened to kill, injure, and continue to detain Ms. Saberi in an attempt to win money or other concessions from the United States. Iran's conduct was hostage-taking as defined under the FSIA.

55. A foreign state is held vicariously liable for the acts of its officials, employees, or agents. 28 U.S.C. § 1605A(c)(4).

56. Ms. Saberi continues to suffer psychological harm to this day as a result of her hostage-taking and torture by Iran.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION – ASSAULT AND BATTERY)

57. Paragraphs 1 through 56 above are incorporated as if set forth herein.

58. Iran committed or is responsible for numerous acts of assault and battery upon Ms. Saberi during her confinement and torture.

59. Under the FSIA, a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

60. Iran is stripped of its immunity under the FSIA because of its acts of hostage-taking and torture, and is therefore liable for torts in the same manner and to the same extent as a private individual.

61. Iran applied force to the person of Ms. Saberi and took actions reasonably tending to create the apprehension of Ms. Saberi that it was about to apply such force to her. Iran also intended harmful or offensive contact with Ms. Saberi without her consent. Iran's conduct included intentionally and repeatedly threatening Ms. Saberi's life.

14

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

62.     Paragraphs 1 through 61 above are incorporated as if set forth herein.

63.     Iran's use of solitary confinement, sleep and sensory deprivation, threats, mental abuse, and restrictions of Ms. Saberi's contact with her family was intentional, reckless, extreme, and outrageous, and caused Ms. Saberi severe emotional distress.

64.     Iran's treatment of Ms. Saberi violated acceptable norms of treatment under both U.S. and international law and was also for that reason extreme and outrageous.

65.     Iran's actions left Ms. Saberi severely emotionally and psychologically damaged for several years.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION – FALSE IMPRISONMENT)

66.     Paragraphs 1 through 65 above are incorporated as if set forth herein.

67.     Ms. Saberi was deprived of liberty without cause and without legal justification. Iran held Ms. Saberi despite knowledge that it had no basis to do so.

## PRAYER FOR RELIEF

1.     As a result of the personal injuries she has suffered due to acts of torture and hostage-taking, Ms. Saberi is entitled to economic damages and compensatory damages for pain and suffering, all of which are recoverable under the FSIA.  28 U.S.C. § 1605A.

2.     In addition to all appropriate compensatory damages, Ms. Saberi is entitled to punitive damages because Iran's acts were intentional, malicious, and performed deliberately to injure, damage, and harm Ms. Saberi.

3.      Ms. Saberi further seeks costs, attorneys' fees, and such other relief as may be just
and proper, including pre-judgment interest.

Dated:  April 17, 2019

Respectfully submitted,

Scott D. Gilbert (D.C. Bar # 290932)
Mark A. Packman (D.C. Bar # 336321)
Samantha R. Miller (D.C. Bar # 1035163)
Gilbert LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Tel:  (202) 772-2200
Fax:  (202) 772-3333
gilberts@gilbertlegal.com
packmanm@gilbertlegal.com
millers@gilbertlegal.com

*Attorneys for Plaintiff Roxana Saberi*