## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROXANA SABERI, <br><br> *Plaintiff*, <br><br> v. <br><br> THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, <br><br> *Defendant*. | No. 19-cv-1081 (DLF) |

## <u>MEMORANDUM OPINION</u>

In 2009, agents of the Islamic Republic of Iran ("Iran") forcibly arrested Roxana Saberi, a United States citizen, and held her hostage for 100 days. Saberi brings this action against Iran under the state sponsor of terrorism exception in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. *See generally* Compl., Dkt. 1. Before the Court is Saberi's Motion for Default Judgment. Dkt. 19. For the reasons that follow, the Court will grant the motion.

## I.      BACKGROUND

### A.      Relevant Findings of Fact[1]

Roxana Saberi is a U.S. citizen who was born in Belleville, New Jersey in 1977. *See* Roxana Saberi Decl. ¶ 1, Dkt. 18-2. Her parents are naturalized U.S. citizens—her father immigrated from Iran and her mother from Japan. *Id.* ¶¶ 2, 5. Saberi was raised in Fargo, North

---

[1] The Court's factual findings are drawn from Saberi's detailed declarations submitted in support of her motion for default judgment. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("In FSIA default judgment proceedings, the plaintiff may establish proof by affidavit.").

Dakota, *id.*, and in 1997, earned a bachelor's degree in communications and French at Concordia College. *Id.* ¶ 9. She went on to earn a master's degree in journalism from Northwestern University in 1999, and a master's degree in international relations from the University of Cambridge in 2000. *Id.* ¶ 10. Thereafter, Saberi began working as a television reporter in her hometown of Fargo, and she later accepted a position in Houston, Texas. *See id.* ¶ 11; Melnicove Decl. ¶¶ 1, 6, Dkt. 18-4.

       1.    *Life in Iran*

In 2003, Saberi accepted an offer from Feature Story News to move to Tehran, Iran and set up a news bureau, viewing it as a "unique, life-changing" opportunity that allowed her to fulfill her dream of being a foreign news correspondent while also learning more about her father's native country. Saberi Decl. ¶¶ 11, 14–15. Originally, she planned to stay "only for a year or two," but Saberi found that she loved living and working in Iran. *Id.* ¶ 17. Her press credentials, issued by Iran's Ministry of Culture and Islamic Guidance, allowed her to attend and report on official government events "in a country where few foreign journalists were permitted to live and work." *Id.* ¶¶ 14–15. And she enjoyed learning more about her Iranian heritage through her new friends in Iran, her Persian courses at the Dehkoda International Center for Persian Studies, and her graduate courses in Iranian studies and international relations at the School of International Relations in Tehran. *Id.* ¶¶ 15–16.

But things in Iran began to take a turn for Saberi in 2006, when Iranian authorities unexpectedly revoked her official press credentials with no explanation. *Id.* ¶ 18. This meant she could "no longer attend or report on government meetings and events," which had been a critical part of her work. *Id.* ¶ 19. Devastated, Saberi considered leaving Iran, *id.* ¶ 20, but ultimately decided to stay and work on a book about life in the country through the eyes of

everyday Iranians, *id.* ¶ 21.  By 2009, she had completed most of her interviews and research, and she began making plans to return to the United States and find a publisher for her manuscript.  *Id.* ¶ 22.

2.    *Saberi's Imprisonment*

Then, everything changed.  On January 31, 2009, four Iranian intelligence agents raided Saberi's Tehran apartment.  *Id.* ¶ 23.  After seizing many of her belongings, the agents forced her into a nearby vehicle and took her to an unmarked building, where she was interrogated for hours in a windowless room.  *Id.* ¶ 25.  The agents focused primarily on her book, insisting that it was a "cover" for CIA intelligence-gathering efforts.  *Id.*  Saberi stressed that she was not a spy and had received no payments for her book, but the agents insisted that she was lying.  *Id.* ¶ 26.

At the end of the interrogation, the agents took Saberi to Evin Prison, where she was blindfolded, strip-searched, and then placed in solitary confinement.  *Id.* ¶¶ 27–28.  The next morning, Saberi was brought before Iran's Revolutionary Court and charged with "acting against Iran's national security."  *Id.* ¶ 32.  There, the presiding magistrate informed Saberi that she could speak with an attorney only at the end of her interrogation, which could last for months, and which would end only once her interrogators were "satisfied" with Saberi's answers.  *Id.* ¶ 33.

Saberi then returned to solitary confinement in Evin Prison.  *See id.* ¶ 34.  Her seven-foot by nine-foot concrete cell was filthy and ant-infested.  *Id.* ¶¶ 28, 34; *see also* Expert Report of Stuart Grassian ("Grassian Report") at 8, Dkt. 18-6.  The only window to the outside world was small and mesh-covered.  Saberi Decl. ¶ 36.  Aside from a few "coarse military blankets" and a "thin, worn-out carpet," the cell had no furnishings.  *Id.* ¶ 34.  And prison guards kept a bright light on twenty-four hours a day.  *See id.* ¶ 28; *see also* Grassian Report at 7–8.

Almost daily, Saberi's captors intensely interrogated her for hours on end.  Saberi Decl. ¶ 40.  During these inquisitions, four or five interrogators would force Saberi to sit in a room "blindfolded at a school desk facing the wall" as they lobbed an array of questions and accusations at her.  *See id.* ¶¶ 40–41.  They accused her, falsely, of having classified documents in her possession, citing an article on Iran-Iraq relations that was discovered in her apartment. *See id.* ¶ 47.  They asked questions about Saberi's book—which her captors alleged was a "cover" for Saberi's work for the CIA—and her journalistic work.  *See id.* ¶ 43.  Her interrogators also ran through lengthy lists of various people with whom Saberi had come into contact with while she was in Iran and ordered her to provide information about each of them, including their views about the Iranian government.  *See id.* ¶ 45.

During these sessions, Saberi's captors frequently threatened both her and her family. *See id.*  They warned that with "agents all over the world," they could easily find her family in the United States, *see id.* ¶ 41, and they insisted that Saberi could be kept at Evin Prison for "ten or even twenty years," if she wasn't executed before then, *see id.* ¶ 42.  They repeatedly threatened to kill her and deny having ever seen her, confirming Saberi's fears that she might be killed without anyone ever knowing what had happened to her.  *See id.* ¶¶ 30, 41–42, 49. Saberi's captors also took great joy in humiliating her.  For instance, they repeatedly taunted her by insisting that she falsely admit to having sex "with practically every man [she] knew."  *See id.* ¶ 44.

All the while, Saberi was promised that if she "cooperated," the interrogation and detention would end and she would be released.  *See id.* ¶ 42.  And eventually, Saberi could no longer endure her "interrogators' relentless threats, accusations, and psychological abuse."  *Id.* ¶ 49.  In the hopes that she would be released as promised, Saberi falsely confessed to spying for

the United States. *Id.* ¶¶ 49–50.  Saberi's captors forced her to put her "confession" in writing and repeat it on camera multiple times. *See id.* ¶ 50.  They then required Saberi to promise that, following her release, she would work as an Iranian spy—though she had no intention of ever keeping this promise. *Id.* ¶ 51.  They also warned that if she told anyone about what had happened to her, she would be "eliminate[d]." *Id.*

After her false confession, Saberi's captors allowed her to call her parents, but they instructed her to tell them she did not know where she was and that she had been arrested for purchasing alcohol. *See id.* ¶ 52.  Following her interrogators' orders, Saberi also warned her parents not to tell anyone, including the media, about her arrest. *Id.*; Akiko Saberi Decl. ¶ 10, Dkt. 18-3.  While Saberi's parents were relieved to hear from their daughter, they grew anxious in the weeks that followed, as they had no way of contacting her or even confirming that she was still alive. *See* Akiko Saberi Decl. ¶ 11; Reza Saberi Decl. ¶ 8, Dkt. 18-5.  In late February, Saberi's parents decided to go public with her arrest, which quickly led to global media attention. Reza Saberi Decl. ¶ 8; Akiko Saberi Decl. ¶ 11.

Meanwhile, Saberi was moved out of solitary confinement and into a larger cell that she shared with a few other female prisoners. Saberi Decl. ¶ 53.  After learning that her cellmates had refused to make false confessions, Saberi vowed to recant her own as soon as possible, regardless of the consequences. *See id.* ¶¶ 53, 56.  In early March, Saberi was again brought before the magistrate in Iran's Revolutionary Court. *See id.* ¶ 55.  When asked to repeat her "confession," Saberi recanted, "knowing full well that it meant [she] would not be released." *Id.* ¶ 56.  That evening in Evin Prison, Saberi informed her chief interrogator that she had recanted her confession, and he responded by admitting that "he had known from the beginning" that it was a lie. *Id.* ¶ 58.  The next day, Saberi was taken back to Revolutionary Court to meet with the

deputy prosecutor for security affairs.  *Id.* ¶ 59.  After she again recanted her false confession, the prosecutor informed Saberi that, while he had initially planned to free her, she would now remain at Evin Prison for "one or two" more years.  *Id.*

With the assistance of an Iranian attorney, Saberi's parents discovered that their daughter was being held at Evin Prison, and they flew to Iran to attempt to secure her release.  *See* Akiko Saberi Decl. ¶ 12; Reza Saberi Decl. ¶¶ 10, 13.  In early April, Saberi's parents were able to visit her at Evin Prison and were shocked by how "frail and distressed" she appeared.  *See* Akiko Saberi Decl. ¶ 13.

Then came Saberi's "trial."  Saberi never had a chance to discuss her case with her attorney in advance of her April 13, 2009 trial.  *See* Saberi Decl. ¶ 64.  In fact, Saberi was given no advance notice of the trial at all, and her attorney—who claimed to be "under pressure" from Iranian authorities—hardly spoke a word throughout the entire proceeding.  *See id.*  No evidence was offered aside from Saberi's false confession.  *See id.* ¶ 65.  The trial itself lasted only about thirty minutes.  *Id.* ¶ 66.  It was closed to the public, the press, Saberi's parents, and Swiss consular officials.[2]  *Id.*  Five days later, the judge convicted Saberi of espionage and sentenced her to eight years in prison.  *See id.* ¶ 67.

Saberi appealed.  *See id.* ¶ 77.  Her appellate trial took place on May 10, 2009, and it lasted around four hours.  *See id.*  As with her trial, Saberi was not allowed to discuss her case with her attorney until just a few minutes before the proceedings began.  *See id.* ¶ 78.  Saberi and her lawyers were also not permitted to examine the "evidence" against her.  *See id.*

---

[2] Swiss consular officials represent the United States' interests in Iran.  *See* Saberi Decl. ¶ 66.

The next day, Saberi was freed after receiving a two-year suspended sentence that included a ban from any journalism work in Iran for five years. *See id.* ¶ 79. Within days, Saberi and her parents flew out of the country. *See id.* ¶ 82.

### 3.  *Purpose of Detention*

According to Saberi's expert, Dr. Mehdi Khalaji, Saberi was "illegally arrested, detained, and abused" as "part of a policy and practice of the Iranian government to seek political advantage through the mistreatment of Iranian-American citizens."[3]  Expert Report of Mehdi Khalaji ("Khalaji Report") at 4, Dkt. 19-8.  More specifically, Saberi's arrest and detention was part of a "series of efforts to create strong leverage" in the regime's negotiations with the Obama Administration, and Saberi was released only "after international pressure" made her continued detention "politically unproductive." *Id.* at 15.

### 4.  *Post-Release Suffering*

After Saberi's release, her experience at Evin Prison continued to haunt her.  Before her confinement, Saberi had been an "outgoing, happy, and cheerful" person who "loved adventures and welcomed challenges."  Akiko Saberi Decl. ¶¶ 3–4; *see also* Melnicove Decl. ¶ 4 (noting Saberi's "enthusiasm and optimism never flagged.  She was always upbeat.").  But after returning from Iran, Saberi was a different person. *See* Akiko Saberi Decl. ¶ 21; Melnicove Decl. ¶ 14. ███████████████████████████████████████████████

Akiko Saberi Decl. ¶ 21. ███████████████████████████████████████

---

[3] Dr. Khalaji is a senior fellow at the Washington Institute for Near East Policy, and holds a master's degree in Western Philosophy from the University of Tarbiat Modarre as well as a doctoral degree in Shiite Theology and exegesis from the University of Sorbonne.  Khalaji Report at 1–2, 19.  He is an expert in the Iranian government's treatment of Iranian-American nationals and has testified and submitted expert reports in a number of similar FSIA cases in this district. *See id.* at 3.



In the first few years after her release, Saberi

*See* Saberi Decl. ¶ 98; *id.* Ex. A; *see also* Grassian Report at 11.  According to Dr. Stuart Grassian, M.D., an expert retained by Saberi to evaluate "the psychiatric effects of her imprisonment," she continues to suffer

[4] *Id.* at 1, 16–17.

*See* Saberi Decl. ¶ 94.

*See id.* ¶ 84; Akiko Saberi Decl. ¶ 12.  She supported herself by doing freelance projects and speaking engagements.  *See* Melnicove Decl. ¶ 25.  In 2013, four years after her release, Saberi returned to full-time journalism when she started reporting for Al-Jazeera America.  *See* Saberi Decl. ¶ 95.  In 2018, she accepted a full-time correspondent role with CBS News in London.  *See id.* ¶ 96.

---

[4] Dr. Grassian is a "Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts."  Grassian Report at 1.  He has been "involved continuously since 1974 in evaluating and treating patients with psychiatric disorders," and has "extensive experience in evaluating the psychiatric effects of stringent conditions of confinement, especially solitary confinement."  *Id.* at 2.  He has also "previously evaluated and prepared reports regarding four American citizens who had been confined in Evin Prison."  *Id.*  Grassian prepared his expert report in this case after interviewing Saberi for over seven hours in early 2020 and reviewing a number of relevant documents, all of which are identified in the report.  *See id.* at 1, 33.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

### B.     Procedural Background

Saberi filed this action on April 17, 2019.  *See* Compl.  She seeks money damages for torture, hostage taking, assault, battery, intentional infliction of emotional distress, and false imprisonment under § 1605A(c)'s private right of action against state sponsors of terrorism.  *Id.* ¶¶ 45–67.

Iran was properly served on February 12, 2020.[5]  *See* Summons Returned Executed, Dkt. 12.  Under 28 U.S.C. § 1608(d), Iran had sixty days—until April 12, 2020—to respond.  Iran failed to appear or respond to the plaintiff's complaint, and the Clerk of the Court entered a default on May 5, 2020.  Clerk's Entry of Default, Dkt. 15.  Saberi subsequently filed the instant motion, *see* Pl.'s Mot. for Default J., and the Court held a hearing on the motion on February 23, 2021.

## II.     LEGAL STANDARD

Under the FSIA, a plaintiff can obtain default judgment by "establish[ing] h[er] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This standard "mirrors" Federal Rule of Civil Procedure 55(d), which governs default judgments against the

---

[5] As discussed *infra* Part III.B, consistent with the requirements of 28 U.S.C. § 1608(a)(4), the Clerk of Court mailed "two copies of the summons and complaint and a notice of suit, together with a translation of each" into Farsi to the United States Department of State for service to be effected through diplomatic channels.  Request for Service of Process, Dkt. 9-1; Certificate of Mailing, Dkt. 11; *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 156 (D.D.C. 2017).

U.S. government.  *Owens v. Republic of Sudan* (*Owens I*), 864 F.3d 751, 785 (D.C. Cir. 2017).

Though this requirement "provides foreign sovereigns a special protection" before a court

reaches default judgment, *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014),

"neither Rule [55(d)] nor § 1608(e) relieves the sovereign from the duty to defend cases,"

*Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (internal citations

omitted).  In fact, "[u]ncontroverted factual allegations that are supported by admissible evidence

are taken as true."  *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42

(D.D.C. 2018); *see also Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C.

2006).  Saberi did not request an evidentiary hearing, and default judgments under § 1608(e)

may rely on a plaintiff's affidavits and declarations.  *Owens I*, 864 F.3d at 788–89.  "[T]he Court

must still determine that an exemption to immunity applies and that the plaintiff has a sufficient

legal and factual basis for [her] claims."  *Abedini v. Gov't of Islamic Republic of Iran*, 422 F.

Supp. 3d 118, 128 (D.D.C. 2019).

## III.    ANALYSIS

### A.    Subject Matter Jurisdiction

This Court has "original jurisdiction without regard to amount in controversy of any

nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect

to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330(a).

All four of those conditions are present here.  To start, this is a nonjury civil action, as

"all federal appellate courts which have considered the issue . . . have held that jury trials are not

available in suits brought under the [FSIA]."  *Universal Consol. Cos. v. Bank of China*, 35 F.3d

243, 245 (6th Cir. 1994); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65

(D.D.C. 2010).  Second, Iran is a foreign state.  Third, this action is in personam because the

Court will exercise "personal jurisdiction over the defendants as legal persons, rather than property." *Id.* Fourth, and finally, the exception to sovereign immunity for state-sponsored terrorism applies.

Although the Court "begins with a presumption of immunity" for foreign states, *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013); 28 U.S.C. § 1604, the state sponsor of terrorism exception under 28 U.S.C. § 1605A(a)(1) eliminates sovereign immunity when "(1) 'money damages are sought,' (2) 'against a foreign state' for (3) 'personal injury or death' that (4) 'was caused' (5) 'by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act.'" *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 79 (D.D.C. 2010) (quoting 28 U.S.C. § 1605A(a)(1)).

All five of those conditions are present here. Saberi seeks money damages for personal injury under § 1605A(c). *See* Compl. at 15. This action and the Clerk of Court's entry of default are against Iran itself, which is a "foreign state" under the FSIA. *See* Clerk's Entry of Default; 28 U.S.C. §§ 1603(a), 1608. To establish causation, Saberi must make "only a showing of proximate cause," which exists so long as there is "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (internal quotation marks omitted). Saberi has made such a showing here, as the connections between Iran's alleged actions and her injuries are both reasonable and clear: Iranian agents unlawfully detained and abused Saberi for 100 days in Evin Prison for the purpose of increasing its leverage in negotiations with the United States. *See supra* Part I.A.2–3. Finally, Saberi seeks money damages for alleged "acts of torture and hostage-taking," and she has shown that Iran's act of

hostage taking "caused her severe and extreme psychological distress, both during and after her imprisonment."  Compl. ¶ 42; *see also id.* ¶¶ 45–56.

The FSIA defines "hostage-taking" by reference to the International Convention Against the Taking of Hostages, which itself defines the act as occurring when one "seizes or detains and threatens to kill, to injure or to continue to detain another person . . . to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, T.I.A.S. No. 11,081, 1316 U.N.T.S. 205.

The FSIA defines "torture" as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1605A(h)(7) (citing Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, (1992), *codified* at 28 U.S.C. § 1350 (note).  To establish torture under the FSIA's terrorism exception, Saberi "must show that the conduct was sufficiently severe and purposeful."  *Warmbier*, 356 F. Supp. 3d at 46.

Here, the uncontroverted evidence establishes that Saberi's captors forced her from her home and held her hostage in Evin Prison for 100 days.  *See* Saberi Decl. ¶¶ 25, 28, 34.  Her "small, filthy cell" was "infested with ants" and lacked a working toilet.  Grassian Report at 7.  The cell's bright light was kept on all day and all night, which made it difficult for Saberi to sleep, as did the lack of a bed to "cushion her against the cold, hard cement floor."  *Id.* at 10; *see* Saberi Decl. ¶¶ 25, 28, 34.  Saberi's captors subjected her to frequent interrogations.  Saberi

Decl. ¶¶ 40–41.  Saberi sat blindfolded for hours on end while they taunted and routinely threatened to kill or harm her or her family if she did not provide a false confession.  *Id.* ¶¶ 40–41.  For a significant portion of her time at Evin Prison, Saberi had "basically no human contact aside from her interrogators."  Grassian Report at 11; *id*. at 7 (describing Evin Prison as a "notoriously frightening and evil" place).  This terrifying experience had profound and immediate effects on Saberi.  For example, throughout her time in custody she suffered uncontrollable panic attacks, and after some interrogation sessions, she was so shaken that she could barely walk.  *Id.* at 9, 11.  When Saberi's parents finally were able to visit her, roughly two months into her confinement, they described her "frail and distressed" appearance as "shocking."  Akiko Saberi Decl. ¶ 13.

Iran's abusive treatment of Saberi was without question cruel and inhumane.  But courts have been given "little guidance" in assessing whether abusive conduct is sufficiently "severe" to constitute "torture" under the TVPA.  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 80 (D.D.C. 2018).  In *Price v. Socialist People's Libyan Aram Jamahiriya*, the D.C. Circuit explained that torture is a label that is "usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain."  294 F.3d 82, 95 (D.C. Cir. 2002) (quoting S. Exec. Rep. No. 101-30, at 14 (1990)) (internal quotation marks omitted).  "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault."  *Id.* at 92.  Because the plaintiffs in *Price* offered "no useful details about the nature of the kicking, clubbing, and beatings" they allegedly suffered, there was "no way to determine… the *severity* of plaintiffs' alleged beatings— including their frequency, duration, the parts of the body at which they were aimed, and the

13

weapons used to carry them out—in order to ensure that they satisfy the TVPA's rigorous definition of torture." *Id.* at 93 (emphasis added).  More recently, in *Simpson v. Socialist People's Libyan Aram Jamahiriya*, the D.C. Circuit held that a plaintiff's allegations that she was "interrogated and then held incommunicado, threatened with death if she moved from the quarters where she was held, and forcibly separated from her husband and unable to learn of his welfare or his whereabouts," were not severe enough to qualify as torture.  326 F.3d 230, 234 (D.C. Cir. 2003) (internal quotation marks and alterations omitted).  While the allegations "certainly reflect[ed] a bent toward cruelty," "they [we]re not . . . so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the [TVPA]." *Id.*

Since *Price* and *Simpson*, however, at least one other court in this district has found abusive conduct similar to that alleged here sufficiently severe to warrant "universal condemnation" and qualify as "torture" under the TVPA.  *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 177 (D.D.C. 2019).  In *Rezaian*, the court found that Iran's actions constituted "torture" where agents arrested an individual at "gunpoint," held him hostage in "unsanitary conditions and solitary confinement, threatened him with death and dismemberment" while trying to elicit a confession, and "provided inadequate food and medical care." *Id.*

Regardless whether Iran's treatment of Saberi was sufficiently severe to constitute "torture" under the FSIA, the uncontroverted evidence establishes that Iran committed an act of hostage taking.  Iran unlawfully detained Saberi and repeatedly threatened to kill or extend her detention to increase its leverage in negotiations with the United States.  *See Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 46 (D.D.C. 2019) ("Political leverage in the context of a country's relationship with the United States is a sufficiently coercive purpose to establish

hostage-taking."); *supra* Part I.A.2–3.  As Dr. Khalaji has explained, Iran's conduct was "part of a policy and practice" to "seek political advantage through the mistreatment of Iranian-American citizens."  Khalaji Report at 4; *see also Khosravi v. Gov't of Islamic Republic of Iran*, 16-cv-2066, 2020 WL 4923495, at *3 (D.D.C. Aug. 21, 2020) (noting that a detention conformed "to the Iranian government's well-documented pattern and practice of behavior towards Iranian-American dual citizens, in which illegal actions were directed against such dual citizens for political purposes of the Iranian regime.") (internal quotation marks omitted).  Because Iran committed an act of hostage taking as defined by the FSIA, the Act's state-sponsored terrorism exception applies, and the Court has jurisdiction to decide this case.

Not only does the Court have subject matter jurisdiction, it must exercise that jurisdiction.  Under the FSIA, the Court "shall hear a claim" when (1) the state was designated a state sponsor of terrorism at the time the act occurred or "as a result of such act;" (2) the plaintiff was a U.S. national, serviceman, employee or contractor for the U.S. government; and (3) the plaintiff afforded the foreign state a reasonable opportunity to arbitrate the claims.  28 U.S.C. §1605A(a)(2).

All three requirements are satisfied here.  Iran "has been designated as a state sponsor of terrorism since 1984."  *Abedini*, 422 F. Supp. 3d at 131; *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Jan. 30, 2021). Saberi is a U.S. citizen by birth and thus has standing to bring a cause of action under the FSIA. *See* 28 U.S.C. § 1605A(c); Saberi Decl. ¶ 1.  And Saberi afforded Iran "a reasonable opportunity to arbitrate," 28 U.S.C. § 1605A(a)(2)(A)(iii), by including an arbitration offer in the documents that were served on Iran, *see* Dkt. 12; *Simpson*, 326 F.3d at 233–34.  The Court therefore has subject matter jurisdiction over Saberi's claims and must hear them.

B.      **Personal Jurisdiction**

The Court also has personal jurisdiction over Iran.  To have personal jurisdiction over a foreign state under the FSIA, a court must have subject matter jurisdiction over the claims and the foreign state must have been properly served.  *See* 28 U.S.C § 1330(b).  As explained above, this Court has subject matter jurisdiction over Saberi's claims.  Iran was also properly served.

The FSIA enumerates four methods for serving foreign states "in descending order of preference."  *Valore*, 700 F. Supp. 2d at 69; *see* 28 U.S.C. § 1608(a).  The first two methods are unavailable here because there is no "special arrangement for service" between the United States and Iran, 28 U.S.C. § 1608(a)(1), and Iran is not party to an "applicable international convention on service," *id.* § 1608(a)(2).  The third method requires "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3).  And the fourth method, effected here, requires "sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the" State Department so service can be effected through diplomatic channels.  *Id.* § 1608(a)(4).  This Circuit has held that "foreign states are not persons protected by the Fifth Amendment," leaving no need to conduct a minimum contacts analysis. *Price*, 294 F.3d at 95 (internal quotation marks omitted).

Saberi first attempted in October 2019 to serve Iran "by any form of mail requiring a signed receipt," 28 U.S.C. § 1608(a)(3); *see* Dkt. 7, but those efforts were ultimately unsuccessful, *see* Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl.'s Mem.") at 18,

Dkt. 18-1; Request for Service of Process, Dkt. 9-1.  Saberi then requested that the Clerk of

Court send "two copies of the summons and complaint and a notice of suit, together with a

translation of each" into Farsi to the U.S. Department of State for service to be effected through

diplomatic channels.  *See id.*; Certificate of Mailing, Dkt. 11.  Service was effected through those

channels on February 12, 2020.  *See* Dkt. 12.  This method of service satisfies § 1608(a)(4).  *See*

*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 156 (D.D.C. 2017).

> **C.** **Liability**

The FSIA by its terms gives Saberi, a U.S. national, standing to bring a cause of action

against Iran, a state sponsor of terrorism, for damages resulting from specific acts, including

"hostage-taking" and "torture."  28 U.S.C. § 1605(a)(1); *see id.* § 1605A(c).  For the reasons

stated *supra* Part III.A, Saberi has shown that Iran committed an act of hostage taking as defined

by the FSIA.  Iran is therefore liable for the injuries Saberi incurred as a result of this hostage

taking.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015).

Although the FSIA provides a private right of action, it requires Saberi to "prove a theory

of liability" found in "well-established principles of law, such as those found in the Restatement

(Second) Torts."  *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 334–35 (D.D.C.

2014) (internal citations omitted).  Saberi asserts four separate theories of liability: false

imprisonment, intentional infliction of emotional distress, assault, and battery.  Compl. ¶¶ 57–67.

False imprisonment occurs "when one person '(a) acts intending to confine the

other . . . within boundaries fixed by the actor, and (b) his act directly or indirectly results in such

a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'"

*Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342–43 (D.D.C. 2016) (quoting Restatement

(Second) of Torts § 35).  Applying this standard to the facts laid out above, the Court has no

trouble concluding that Iran falsely imprisoned Saberi for 100 days.  *See Abedini*, 422 F. Supp. 3d at 133.

Turning to Saberi's second theory, "one who by extreme and reckless conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).  The "intensity and the duration of the distress are factors to be considered in determining its severity."  Restatement (Second) of Torts § 46 cmt. j.  There can be no doubt that Iran intentionally detained and abused Saberi for 100 days, and the uncontroverted evidence establishes that Saberi has suffered—and continues to suffer—from severe emotional distress as a result.  *See generally* Grassian Report.  Consequently, Iran is liable to Saberi for intentional infliction of emotional distress.

Assault "occurs when one person (a) 'acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.'" *Stansell*, 217 F. Supp. 3d at 343 (quoting Restatement (Second) of Torts § 21(1)).  "'Harmful contact' is that which causes 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Id.* at 342 (quoting Restatement (Second) of Torts § 15).  Saberi has attested that her captors routinely threatened her with death and physical harm, which caused her imminent apprehension that she would be seriously injured or killed.  *See* Saberi Decl. ¶¶ 30, 35, 41.  Iran is thus liable to Saberi for these acts of assault.

Battery requires an act "intending to cause a harmful or offensive contact with . . . [another person], or an imminent apprehension of such a contact," and the offensive contact in fact "directly or indirectly results."  Restatement (Second) of Torts § 18.  And "bodily

contact is offensive if it offends a reasonable sense of personal dignity." *Id.* § 19.  Saberi's

Iranian captors forced her out of her apartment, strip-searched her, and repeatedly moved her

around the prison—each time against her will.  *See* Saberi Decl. ¶¶ 25, 40.  Each offensive

contact was an act of battery.  *See Rezaian*, 422 F. Supp. 3d at 179.

### D.     Damages

Having established her claims by satisfactory evidence, the FSIA allows Saberi to

recover "money damages."  28 U.S.C. § 1605A(c).  It further specifies that those "damages may

include economic damages, solatium, pain and suffering, and punitive damages."  *Id.*  To recover

for past losses, a plaintiff must "prove the fact of injury with reasonable certainty," *Samaritan*

*Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), and must "reasonably

prove" the amount of damages, *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  To

recover for future losses, a plaintiff similarly "must prove that the projected consequences are

'reasonably certain' (i.e., more likely than not) to occur and must prove the amount of damages

by a 'reasonable estimate.'"  *Id.* at 681.  These standards mean that a default winner under the

FSIA "must prove damages in the same manner and to the same extent as any other default

winner."  *Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012) (internal

quotation marks omitted).  A court may "take into account any special problems of proof arising

from the defendant's absence."  *Hill*, 328 F.3d at 685.

### 1.     Pain and Suffering

Saberi seeks damages for the pain and suffering that she endured during her captivity and

following her release.  This district has developed a "formula for awarding damages" to victims

of terrorist attacks held for prolonged periods.  *Surette v. Islamic Republic of Iran*, 231 F. Supp.

2d 260, 268 (D.D.C. 2002).  Under this formula, courts award roughly $10,000 "for each day of

captivity for the intense suffering experienced by a hostage during captivity." *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 100 (D.D.C. 2003); *see also Hekmati*, 278 F. Supp. 3d at 164 (collecting cases). "Seeing no reason to deviate from this formula," *Abedini*, 422 F. Supp. 3d at 137, the Court will award $1 million for the pain and suffering Saberi experienced during her 100 days in captivity.

While this award represents a reasonable estimate of pain and suffering damages for Saberi's time in confinement, it "fails to account" for the pain and suffering that she has experienced following her release. *See Stansell*, 217 F. Supp. 3d at 346. Thus, Saberi may receive an "additional lump sum," *id.*, which accounts for the trauma that Saberi has endured— and will continue to experience—as a result of her confinement. *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 165 (awarding $10 million for "post-release pain and suffering"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005) (awarding $7 million to compensate for damages "likely continue to endure throughout the rest of their lives").

When calculating post-captivity awards, courts routinely consider (1) the "length and severity" of the plaintiff's torture and detention; (2) the "extent of the plaintiff's lasting physical and mental injuries;" and (3) the plaintiff's "age at the time of release" as well as "the estimated number of years that the plaintiff can be expected to suffer from these injuries." *Azadeh v. Gov't of Islamic Republic of Iran*, 16-cv-1467, 2018 WL 4232913, at *19 (D.D.C. Sept. 5, 2018); *see also Hekmati*, 278 F. Supp. 3d at 164. Recent awards in similar FSIA cases "help guide the Court through this delicate terrain," *Abedini*, 422 F. Supp. 3d at 137, given the importance of ensuring that "individuals with similar injuries receive similar awards," *Moradi*, 77 F. Supp. 3d at 70 (internal quotation marks omitted). With these considerations in mind, courts in this district have applied *Hekmati*'s $10 million post-captivity pain and suffering award, 278 F. Supp.

3d at 163–64, as a baseline in comparable FSIA hostage taking cases, making appropriate adjustments based on these factors.  *See, e.g., Abedini*, 422 F. Supp. 3d at 127, 137 (awarding $9,630,000 to a plaintiff who was 32 years of age at the time of release and endured 1,268 days of "mental and physical torture" in Evin Prison, followed by PTSD and clinical depression); *Azadeh*, 2018 WL 4232913, at *19–20 (awarding $8,888,889 to plaintiff who was 42 years old at time of release and subjected to permanent and severe physical and psychological injuries as a consequence of her 114 days of captivity and torture in Evin Prison).

Compared to Saberi's 100 days, *Hekmati* and *Abedini* involved significantly longer periods of detention.  *See Hekmati*, 278 F. Supp. 3d at 163 (1,602 days); *Abedini*, 422 F. Supp. 3d at 126, 137 (1,268 days); *see also Rezaian*, 422 F. Supp. 3d at 180 (544 days).  And though Saberi was subjected to similarly appalling conditions of confinement and psychological abuse in Evin Prison, she did not experience the same degree of physical abuse.  *See Abedini*, 422 F. Supp. 3d at 127 (plaintiff was beaten, whipped, socked using a taser gun on his kidneys, and hung from handcuffs from the ceiling); *Hekmati*, 278 F. Supp. 3d at 151, 164 (plaintiff was repeatedly beaten with batons, struck in his kidneys with an electric taser, and handcuffed "in stress positions for hours at a time"); *see also Azadeh*, 2018 WL 4232913, at *11–12 (plaintiff received inadequate medical care, was forced to take mood-altering drugs, and was subjected to mock executions).  But at the time of her release, Saberi was only 32 years of age and had a longer life expectancy of 50 years.  Pl.'s Mem. at 50; *see Abedini*, 422 F. Supp. 3d at 126, 137 (35 years old at release and 43.2-year life expectancy); *Hekmati,* 278 F. Supp. 3d at 164 (32 years old at release and 45-year life expectancy); *Azadeh,* 2018 WL 4232913, at *11–12 (42 years old at release and 40-year life expectancy).  And like other Evin Prison captives, ███   Grassian Report at

12, 16; ████████████████████████████████████; *see also* Supp.

Saberi Decl. ¶¶ 5–6.

Recognizing the inherent difficulty in "putting a number on these kinds of harms,"
*Moradi*, 77 F. Supp. 3d at 70 (internal quotation marks omitted), the Court will adopt the
*Hekmati* award as a baseline and adjust it to account for these differences.  *See Doe v.
Democratic People's Republic of Korea*, No. 18-cv-252, 2021 WL 723257, at *6 (D.D.C. Feb.
24, 2021) at *12–13, 14 n.6 (adopting *Hekmati* baseline and awarding plaintiffs between
$200,000 and $17,400,000 in post-release damages based on relevant factors, including the
nature and extent of injuries and the actual and anticipated years of suffering).  Considering the
relevant factors and post-captivity awards rendered in similar cases, the Court will award Saberi
$9 million to compensate her for the psychological pain and suffering she has endured and likely
will continue to endure for the next four decades.

### 2.    *Economic Damages & Medical Expenses*

In FSIA cases, "lost earnings—past and future—are compensable economic damages,"
*Moradi*, 77 F. Supp. 3d at 71 (internal citation omitted), and "the report of a forensic economist
may provide a reasonable basis for determining the amount of economic damages," *Reed v.
Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *see Hekmati*, 278 F. Supp. 3d
at 164 (collecting cases).  "This Court should, however, take account of the reasonableness and
foundation of the assumptions relied upon by the expert[s]."  *Abedini*, 422 F. Supp. 3d at 138
(internal quotation marks omitted).

To support her claim for economic damages, Saberi relies on the report of Dr. Stuart
Grassian who evaluated her psychiatric injuries, *see* Grassian Report; *see also supra* at 8 n.4, as

well as letters from ██████████████████████████ [6] █

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████ *see also* Supp. Saberi Decl. ¶¶ 5–6 ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ Grassian Report

at 17.

Saberi also submitted two earning capacity evaluations prepared by Robert Taylor,[7] *see*

Earning Capacity Evaluation and Assessment of Future Care Needs ("Taylor Report"), Dkt. 18-

7; Earning Capacity Evaluation and Assessment of Future Care Needs - Supplemental ("Supp.

Taylor Report"), Dkt. 25-5, and a forensic economic report prepared by Dr. Frank Slesnik,

Ph.D.,[8] *see* Expert Report of Frank Slesnik, Ph.D. ("Slesnik Report"), Dkt. 18-8.  Taylor

concluded—████████████████████████—that it is "probable" that Saberi

---

[6] ██████ is a "New York State licensed Clinic Psychologist" ████████████
██████████████████ Letter at 1.

[7] Taylor, the Director Emeritus of Vocational Diagnostics, Inc., is a rehabilitation counselor who specializes in assessing "an individual's ability to earn wages with or without consideration of the impact of an impairment on their ability to work."  Taylor Report at 3–4.  He has published a number of peer-reviewed papers in this area, *id.*, and has submitted earning capacity evaluations in similar FSIA cases in this district.  *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 165.

[8] Slesnik, Professor Emeritus of Economics at Bellarmine University, *see* Slesnik Report at 1, 18, has "been a consultant and expert witness in over 700 cases," *id.* at 26, and has submitted expert reports in other FSIA cases in this district, *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 165–66.

will ████████████████████████████████████████████

████████████████████████████ *Taylor Report* at 13, 21–23; *see also* Slesnick Report at 10

████████████████████████████████████████████████████

Taylor further concluded that Saberi's ██████████████████████████

████████████████████████████ *Taylor Report* at 13, 21–23 ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

*see also* Saberi Decl. ¶ 100.  Taking into account Saberi's experience and qualifications, and salary ranges for network correspondents with varying levels of experience, Slesnick estimates that Saberi's "most likely range of economic loss is $15,978,270 to $17,225,108."  Slesnick Report at 8–11.[9]

The salary calculations in the Slesnick report are based on salary ranges provided by Olivia Metzger, a news and media industry agent who has negotiated salaries for "numerous anchors, correspondents, producers, and other news professionals" that form a subset of her roughly 100 clients.  *See* Metzger Decl., Dkt. 18-9; Supp. Metzger Decl. ¶¶ 5–6, Dkt. 25-1. Metzger attests that, in her experience, "typical salaries at national networks range from ████████████████████████ for entry-level correspondents (0-3 years of network experience); ████████████████████ for mid-level correspondents (3-6 years of experience); and ████████████ ████████████ for highly experienced correspondents (6+ years of experience)."  Supp. Metzger

---

[9] To calculate the net present value of Saberi's lost wages, Slesnick noted that the net discount rate—the difference between the rate of increase in earnings and the discount rate—is a negative value, which implies that "earnings are rising faster than the discount rate."  Slesnick Report at 6. Accordingly, to calculate the net present value of Saberi's lost earnings, Slesnick assumed that the net discount rate was "equal to zero rather than a negative value," which, in effect, lowered Saberi's "estimated economic loss."  *Id.* at 5–6.

Decl. ¶ 7.  Metzger admits that salaries vary "within these ranges based on network, specific expertise, and other factors," *id.* ¶¶ 7–8, but for client confidentiality reasons, she provides no details about the number or the distribution of correspondents within these broad ranges, including the median salaries.  Nor does Metzger provide any specific information about individual news correspondents and their respective experience levels, geographical work locations, or salaries.

Although the Court accepts the experts' methodologies, it does not accept the salary assumptions on which they relied.  The Court recognizes that national news networks "typically do not disclose salary information to the public," Supp. Metzger Decl. ¶ 9, and therefore it is difficult to obtain more detailed or representative salary data for their correspondents, *see* Pl.'s Supp. Mem. in Supp. of Mot. for Default J. ("Pl.'s Supp. Mem.") at 2, Dkt. 25.  But Metzger's generalized estimates of "typical salaries" at "national networks" for entry-level, mid-level, and high-level correspondents, Metzger Decl. ¶ 3, do not provide a reasonable estimate of Saberi's lost wages, particularly here, where they are not consistent with Saberi's salary history.

Since Saberi's release from Evin Prison in 2009,[10] her annual income has ranged from ███████████████.[11]  *See* Slesnick Report at 2.  And since January 2018, when Saberi joined CBS News as a full-time correspondent, her salary has remained constant ██████████████.

---

[10] Saberi has no "record of her earnings in the years leading up to her imprisonment," ████████
████████████████████████████████████  Pl.'s Supp. Mem. at 2.

[11] These figures include business income Saberi earned during this period from "speaking engagements, royalties derived [from her] book, and other publications."  Slesnick Report at 2.

*See* Taylor Report at 9 ███████████████████████████████████████████

███████████████ [12]

    Saberi's salary history thus diverges from the Metzger ranges in two ways.  First,

Saberi's starting salary ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████ *Id.* at 10 (noting that Saberi was a full-time correspondent and fill-in anchor for

Al-Jazeera America from July 2013 to April 2016 and a freelance correspondent for CBS News

from September 2016 to December 2017).  More importantly, since Saberi joined CBS News,

her annual salary has stayed the same.  *Id.* at 9; *cf.* Supp. Metzger Decl. ¶ 7 ████████

████████████ for correspondents with "3-6 years of [network] experience" and ████████

███████████ for correspondents with "6+ years of experience").[13]

    Saberi has not shown by "evidence satisfactory to the Court," 28 U.S.C. § 1608(e), that

the salary ranges on which her experts relied constitute reasonable estimations of *her* lost

earnings.  And aside from her current and past salaries, Saberi has provided no other evidence on

which the Court may reasonably base an award for lost earnings.[14]  For these reasons, the Court

---

[12] The Court recognizes that the amount of gross wages that Saberi has earned at CBS News has
varied slightly year to year.  *Compare* Taylor Report at 16 ██████████████████████
████, *with* Supp. Saberi Decl. at 12 ████████████████████████████████  Even so,
as Saberi herself has suggested, ███████ represents a fair approximation of her current salary
with CBS News, *see* Taylor Report at 10.

[13] As further support for the economic damages she seeks, █████████████████████████
████████████████████████████████████████████████████████████████████████  Supp.
Saberi Decl. ¶ 3.  But Saberi provides no further details regarding that potential salary, and
Metzger's declaration provides no specific information or data about news correspondent salaries
in any particular geographical area, including the Middle East.  *See id.*; Pl.'s Supp. Mem. at 2.

[14] The Court notes, however, that Saberi did provide, in response to the Court's request, *see*
Minute Order of February 23, 2021, a report issued by the U.S. Bureau of Labor Statistics, which

will instead use Saberi's current salary ████████ as a baseline to calculate her lost wages.  *Cf.*

*Abedini*, 422 F. Supp. 3d at 138 (awarding reduced damages award of five years in lost wages

where the plaintiff "ha[d] not shown by 'evidence satisfactory to the court,' that he would never

work again," and the plaintiff's experts had "not provided any alternative models for lost-wage

calculations").  Recognizing the substantial impact that Saberi's confinement, ████████

████████ had on her ability to work ████████████████████████

████████████████████ the Court will award Saberi $763,484 in lost past

wages—the cumulative difference between her annual income during this period and ██

████████████████████.  For the same reasons, there is a reasonable

basis to conclude that ████████████████████████████

████████████.  *See* Taylor Report at 23; Slesnick Report at 10.  Thus, consistent with

the analysis set forth in the expert reports, the Court will award Saberi an additional $1,341,250

in lost future wages.  *See* Taylor Report at 10, 24; Slesnick Report at 7.

Saberi also seeks to recover for her ongoing medical expenses.  *See* Pl.'s Mem. at 32.  ██

████████████████████████████████████

████████████████████.  *See* Grassian Report at 17.  Both Taylor and Slesnick

estimate that the total lifetime costs for Saberi's ongoing treatment will range from $26,882.88 to

$65,810.74.[15]  Taylor Report at 32; Slesnick Report at 13.  The Court concludes that these expert

---

estimates that the average salary for news analysts, reporters, and journalists in the United States
is $62,400, and the median salary is $46,270.  *See* Dkt. 25-2.  Given that these estimates are
considerably lower than Saberi's current salary, this report is a less reliable basis on which to
estimate her lost earnings.

[15] Because these medical costs are projected to rise at a higher rate than the net discount rate,
both the Slesnick and Taylor reports assumed that the rate of increase in medical care prices and
the discount rate were equal.  *See* Slesnick Report at 13.

reports provide a reasonable basis for awarding Saberi $46,346.81—the midpoint of this range—for her past and future medical treatment.  *See Khosravi*, 2020 WL 4923495, at *7 (awarding economic damages for plaintiff's past and future costs for "medical and mental health treatment" required for "injuries sustained during his detention").

### 3.   *Punitive Damages*

Finally, Saberi seeks an award of punitive damages.  Compl. at 15–16.  "Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012).  They are not intended to compensate victims, but rather to award "an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future."  *Id.* at 56.  "Courts routinely award punitive damages in cases brought under the terrorism exception to the Foreign Sovereign Immunities Act."  *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020).

To determine the appropriate amount of punitive damages to award, courts consider: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Warmbier*, 356 F. Supp. 3d at 59 (internal quotation marks omitted).  "Taking these factors into account," courts in this district have taken three approaches to calculating punitive damages in state-sponsored terrorism cases.  *See id.* at 59–60 (discussing each approach and collecting cases).  The first approach, often used in exceptionally deadly attacks, is to multiply the foreign state's yearly expenditures on terrorism by a factor between three and five.  *Id.*  A second approach ties punitive damages to the compensatory damages award, using a ratio set

forth in earlier cases involving similar conduct.  *Id.*  And the final approach awards $150 million to each affected family.  *Id.*

The first approach is not appropriate here because this case does not involve an "exceptionally deadly" attack.  *Frost*, 419 F. Supp. 3d at 117.  Saberi encourages the Court to adopt the third approach and award her $150 million in punitive damages, *see* Pl.'s Mem. at 34, but that method "is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened here."  *Frost*, 419 F. Supp. 3d at 117.  Like other courts in this district, the Court will adopt the second approach and tie punitive damages to compensatory damages.  *See Abedini*, 422 F. Supp. 3d at 142 (collecting cases).  Only in "special circumstance[s]" have courts multiplied compensatory damages under this approach.  *Id.*  Therefore, the Court will award Saberi punitive damages equal to her compensatory damages award.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for default judgment is granted.  A separate order consistent with this decision accompanies this memorandum opinion.

March 30, 2021

DABNEY L. FRIEDRICH
United States District Judge